COMMONWEALTH vs. TIRRELL KITCHINGS
(and two companion cases[1]).

Nos. 95-P-1578, 95-P-1579, & 95-P-1642.

Middlesex. March 19, 1996. - June 18, 1996.

Present: ARMSTRONG, GILLERMAN, & LENK, JJ.

*Constitutional Law,* Search and seizure, Probable cause. *Search and Seizure,* Threshold police inquiry, Probable cause, Automobile, Container. *Threshold Police Inquiry. Probable Cause. Practice, Criminal,* Required finding. *Firearms.*

A police officer's routine inquiry of the driver of a van with no registration plate parked in a restaurant parking lot, resulting in his noticing a strong odor of burnt marijuana coming from the vehicle, gave rise to a reasonable suspicion that the four men in the van were in possession of a controlled substance in violation of G. L. c. 94C, § 34, and justified the officer's placing two of the men in his cruiser and searching the vehicle: his discovery of a loaded ammunition clip in plain view further justified his search of the vehicle and his seizure of two guns and another clip along with a quantity of marijuana. [595-598]

A police officer's objectively warranted concern for his own and public safety justified his forceful inquiry of four men he had just taken into custody as to the whereabouts of "the gun" whose loaded clip he had seen in plain view in the men's vehicle and, in the circumstances, he was not required to give them Miranda warnings before so inquiring. [598-599]

Evidence at the trial of a complaint for unlawful possession of a firearm in a vehicle, together with reasonable inferences therefrom, was sufficient to permit a finding of guilty beyond a reasonable doubt. [599-600]

COMPLAINTS received and sworn to in the Lowell Division of the District Court Department on September 6, 1994.

On transfer to the jury session of that division, pretrial motions to suppress evidence were heard by *William E. Melahn,* J., and the cases were tried before him.

*Lisa J. Steele* for Tirrell Kitchings.
*Mark R. Meehan* for Leon L. Dorch.

[1]Commonwealth *vs.* Leon L. Dorch; Commonwealth *vs.* John Rudolph.

*James M. Hankin* for John Rudolph.

*Peter Schlossman*, Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. On the evening of September 4, 1994, the defendants Kitchings, Dorch, and Rudolph, and their companion, Robert Moore,[2] were parked in the parking lot of a Burger King restaurant. The three defendants had driven up from South Carolina headed for Lowell. As a result of the events described below, the defendants were each charged with unlawful possession of a firearm in a vehicle, G. L. c. 269, § 10(*a*), unlawful possession of ammunition, G. L. c. 269, § 10(*h*), and possession of marijuana, G. L. c. 94C, § 34.

After a hearing, the judge denied the defendants' motions to suppress all evidence obtained as a result of a warrantless search of the van in which the defendants were riding, and a jury subsequently returned guilty verdicts against the three defendants on all charges. The defendants were each sentenced to a term of one year in the Billerica house of correction for possession of a firearm without a license. The convictions for unlawful possession of ammunition and marijuana were placed on file without objection.

After the hearing on the defendants' suppression motions, the judge filed his findings of fact and decision. Absent a showing of clear error, we accept the motion judge's findings and give substantial deference to his rulings of law based on those findings. *Commonwealth* v. *Cast*, 407 Mass. 891, 897 (1990), and cases cited. We summarize those findings below.

All the defendants argue that the judge erred in denying their suppression motions. The defendant Rudolph also contends that the judge erred in denying his motion to suppress a statement made by him, and the defendant Kitchings contends that his motion for a required finding of not guilty should have been allowed. We agree with the judge's conclusions (although not his precise reasoning) in each instance,[3] and affirm.

---

[2]Identical complaints issued against all four men; the charges against Moore were later dropped.

[3]"[Since the admissible evidence] and the facts found by the judge support the theory relied upon by the court, it is of no consequence whether the precise reasons assigned by the judge are accurate." *Commonwealth* v. *Cast*, 407 Mass. at 897.

*The motion hearing.* On September 4, 1994, at approximately 5:05 P.M., a Dodge van drove past Massachusetts State Trooper John Barrett on Route 110 in Lowell. Barrett was alone on a routine patrol in a marked cruiser. He noticed that affixed to the vehicle was a plastic dealership tag, "M & M Motors," but an official State registration plate appeared to be missing. Barrett followed the van into a Burger King parking lot. After the van parked, Barrett pulled up behind the van.

Barrett approached Moore, the driver of the vehicle, who had stepped out of the van. In response to Barrett's requests, Moore produced a Massachusetts driver's license, and Moore obtained from the defendant Tirrell Kitchings, who was seated in the front passenger seat of the van, a copy of a rental agreement for the van. The rental agreement stated that David Johnson was the approved driver of the van. Moore also told Barrett that Kitchings was the person who had rented the van.

Barrett, proceeding to the passenger side of the van, asked Kitchings for his license. Kitchings produced a South Carolina driver's license, and he told Barrett that Johnson was a friend who had rented the van as a favor to Kitchings.

There were two additional passengers in the van who were later identified as the defendants John Rudolph and Leon L. Dorch. Both were seated in the row of seats behind the driver. Turning to these passengers, Barrett asked for identification. They had none. No one in the van claimed to be Johnson, the only authorized driver.

While questioning Moore and the three defendants, Barrett, who had training and experience in narcotics detection as a member of a drug task force, noticed a "very strong odor of burnt marijuana," and he observed that the van "absolutely reeked of it. . . it had to be fresh."[4] Barrett asked the four men to step out of the van. They did so, and appeared to be "in a nervous state." Barrett, alone and concerned for his

---

[4]The judge made no explicit finding that Barrett observed that the van "reeked" of marijuana, and that it was "fresh." Nevertheless, Barrett was the only witness at the hearing on the motion to suppress, and the judge plainly credited Barrett's testimony. Thus we adopt Barrett's testimony as to certain additional facts. See *Commonwealth* v. *Wedderburn*, 36 Mass. App. Ct. 558, 562 (1994); *Commonwealth* v. *Harding*, 27 Mass. 430, 431 (1989).

own safety, proceeded to pat-frisk each of the four men. He found a large sum of cash in Dorch's front pocket.

Barrett then placed both Dorch and Rudolph, uncuffed, in the back of his cruiser. He turned to Moore and Kitchings who by now had returned to the van and were again seated in the front seats.

As Barrett approached the van from the passenger side, he looked through the window and saw a loaded ammunition clip for a semi-automatic pistol in the van's open glove compartment. Seeing the clip, Barrett promptly placed Moore and Kitchings, uncuffed, in the rear of his cruiser along with Rudolph and Dorch.

Outnumbered four to one, and exceedingly concerned for his own safety, Barrett called for back-up assistance. The judge credited Barrett's testimony that he was "scared shit-less" — a concern which the judge found was fully justified. It was at this point that Barrett turned to the four men in his cruiser and shouted, "Where is the fucking gun?" Rudolph said, "The gun's on the back seat."

In the back of the van underneath a sweatshirt Barrett found a Glock 40-caliber semi-automatic pistol, which was loaded with fifteen yellow jacket hollow point bullets,[5] and an unloaded nine millimeter semi-automatic pistol. Barrett also found a second loaded clip right beside it.

The backup trooper was Trooper Day; she arrived minutes after Barrett's call. Barrett then turned to the four men in his cruiser and asked whether anybody had a permit for the guns; no one answered.[6]

Meanwhile, Day found some empty baggies and one full "dime bag" of marijuana in the van. Barrett then transported Dorch and Rudolph to the Concord barracks; they were in the back seat. Trooper Day transported Moore and Kitchings. Later, when Barrett searched the back seat of his cruiser to see if it was clear, he found some marijuana.[7]

Each of the defendants was booked and advised of his Mi-

---

[5]The judge found that yellow jacket hollow point bullets are designed to inflict severe damage to the human body.

[6]See note 4, *supra,* as to this statement by Barrett.

[7]There was also testimony, but no findings, to the effect that, as a result of a later search of the van and the men, Barrett found $1,400 on Dorch, $800 on Kitchings, and $600 in a pair of pants that Rudolph said were his. The four men were then placed under arrest. They were given *Miranda* warnings as they were being transported to the barracks.

randa rights. Before questioning each defendant, Barrett again read each man his *Miranda* rights. Thereafter, Dorch, Rudolph, and Kitchings each stated, separately, that David Johnson had rented the vehicle on their behalf and that they did not have to pay him back. Each one explained that they had driven from South Carolina to Delaware then to New York before reaching Lowell. They all admitted to smoking marijuana, and each one admitted knowing about either one or both of the guns in the van.

*The trial.* At trial, Barrett's testimony was substantially the same as his testimony at the suppression hearing. Two additional witnesses testified for the Commonwealth at trial who did not testify at the motion hearing: Trooper Day, who was the back-up trooper and Robert Moore, the driver of the van. None of the defendants testified or called any witnesses.

The two guns, ammunition, corresponding certificates of analysis, ammunition clips, the bag of marijuana, a cigarette "joint," and the analysis of the marijuana were all admitted in evidence without objection by the defendants.

*Discussion — the motions to suppress.* There being no stop of the van by Barrett — the van was already parked in the Burger King lot — the mere questioning of Moore and Kitchings following Barrett's observation that a State registration plate appeared to be absent, was a routine inquiry that required no justification. There was no show of force and no restraint of anyone's liberty. See *Commonwealth* v. *Leonard*, 422 Mass. 504, 508 (1996), citing *Terry* v. *Ohio*, 392 U.S. 1, 19 (1968); *Commonwealth* v. *Fraser*, 410 Mass. 541, 543-544 (1991).

Barrett's additional questions to Rudolph and Dorch were also routine inquiries, given the fact that the rental agreement named a David Johnson as the only authorized driver. As noted above, David Johnson was not to be found inside the van.

However, matters quickly became more serious when, during his questioning, the officer noticed a "very strong odor of burnt marijuana." The van reeked of the odor, and it was fresh. At this point, Barrett was confronted with the suspected unlawful presence of marijuana in the van, the absence of any recognizable registration plate, the absence of the authorized driver for the van, the nervous state of the defendants, the discovery of a large amount of cash in Dorch's front pocket,

and the fact that he was alone, facing four men. These circumstances were sufficient to justify Barrett's reasonable suspicion, based on articulable facts, that the defendants may have been unlawfully in possession of a controlled substance in violation of G. L. c. 94C, § 34, with the result that Barrett was justified in imposing an investigative stop upon the defendants, provided the degree of intrusion was reasonable under the circumstances. See *Commonwealth* v. *Varnum*, 39 Mass. App. Ct. 571, 574-575 (1995); *Commonwealth* v. *Andrews*, 34 Mass. App. Ct. 324, 328 (1993).

Placing Dorch and Rudolph, uncuffed, in the cruiser in order to permit Barrett to continue his investigation was reasonable under the circumstances. There was the immediate need to search the van for contraband,[8] Barrett was alone and

---

[8]The judge concluded, and we agree, that the detection of a strong, fresh odor of burnt marijuana emerging from a motor vehicle provided probable cause to search the vehicle. See *Commonwealth* v. *Skea*, 18 Mass. App. Ct. 685, 690 n.8 (1984) ("It is widely accepted that the discovery of some controlled substances gives probable cause to search for additional controlled substances in the vicinity."); *Commonwealth* v. *Monterosso*, 33 Mass. App. Ct. 765, 769 (1992) (probable cause established where smell of burning marijuana is detected in a common hallway outside an apartment, and an informant's prediction that the odor would be detected by standing immediately outside of the suspected apartment).

Many jurisdictions have determined that the smell of marijuana alone provides probable cause to search an entire automobile. *United States* v. *Padron*, 657 F.Supp. 840 (D. Del. 1987), aff'd, 857 F.2d 1466 (3d Cir.), cert. denied sub nom. *Rubio* v. *United States*, 488 U.S. 974 (1988). *State* v. *Harrison*, 533 P.2d 1143, 1144 (Ariz. 1975) (officer who properly stopped car and smelled marijuana had probable cause to make further search and to arrest driver). *State* v. *MacDonald*, 856 P.2d 116, 120 (Kan. 1993) (detection of odor of fresh marijuana or marijuana smoke, standing alone, provided probable cause for motor vehicle search following traffic checklane stop). *State* v. *Fuente*, 871 S.W.2d 438, 441 (Mo. 1994) (where trooper had legitimate reason for stopping vehicle and detected marijuana odor, trooper had probable cause to search vehicle). *Hart* v. *State*, 639 So. 2d 1313, 1316 (Miss. 1994) (police officers had probable cause to search automobile of driver stopped for speeding, where strong odor of marijuana was present in automobile). See also 2 LaFave, Search and Seizure § 3.6(b), at 290-291 (3d ed. 1996) ("the courts have found probable cause to search when the distinctive odor of marijuana is found emanating from a particular place and have likewise found probable cause to arrest when the odor was detected coming from a particular person."); Annot., Odor of Narcotics as Providing Probable Cause for Warrantless Search, 5 A.L.R. 4th 681, 685 ("it frequently has been held that detection of the odor of fresh marijuana or marijuana smoke, standing alone, provided probable cause for

understandably anxious, and the four men were visibly nervous. Placing Dorch and Rudolph in the rear of his cruiser while the investigation continued involved a degree of intrusion which was "proportional to the degree of suspicion that prompted the intrusion" and did not exceed the scope of an investigative stop. See *id.* at 328-329. Moreover, securing Dorch and Rudolph was a reasonable precaution for Barrett's safety. See *Commonwealth* v. *Willis,* 415 Mass. 814, 819-820 (1993) (in assessing the degree of intrusiveness as it relates to the degree of suspicion, the "most important" factor is the degree of danger to the safety of the officers or the public or both); *Commonwealth* v. *Moses,* 408 Mass. 136, 144 (1990); *Commonwealth* v. *Varnum, supra* at 575.

The circumstances facing Barrett continued to deteriorate rapidly after he secured Dorch and Rudolph. Returning to the van, he saw (through the passenger window) a loaded ammunition clip for a semi-automatic pistol in the van's open glove compartment in plain view. Understandably, he was now concerned for his safety. Immediately, he called for back-up assistance and placed Moore and Kitchings in the cruiser, uncuffed, and shouted, "Where is the fucking gun?" No one could mistake the meaning or seriousness of that question, and Rudolph answered, "The gun's on the back seat." No mention was made of a license for the gun.

In the circumstances recited above, now made even more menacing with the sight of the loaded clip and the verbal exchange about the whereabouts of the gun, Barrett had probable cause to believe that the three defendants were unlawfully in possession of a firearm, and that the firearm was in the van.[9] He was entitled to search every part of the vehicle and its contents in his effort to find and seize the weapon. *Commonwealth* v. *Moses,* 408 Mass. at 145 (Under art. 14 and the Fourth Amendment, there may be a lawful warrantless search of a motor vehicle if based on probable cause to search the vehicle, and the search may extend to all contain-

searches of motor vehicles following stops . . . for investigation of possible traffic or equipment violations"). But see *People* v. *Hilber,* 403 Mich. 312, 321-329 (1978), upon which the defendants rely (distinguishing among the odors of unburned, burning, and burnt marijuana, and finding the aroma of burned marijuana to be the least probative and insufficient to sustain probable cause in the circumstances).

[9]*Commonwealth* v. *Couture,* 407 Mass. 178, 181, cert. denied, 498 U.S. 951 (1990), cited by Dorch, has no relevance to the facts of this case.

ers, open and closed). See also *Commonwealth* v. *Owens*, 414 Mass. 595, 600 (1993) ("If a reasonably prudent police officer believes his safety or the public's safety is in danger, regardless of probable cause to arrest, he is warranted in conducting a search to discover weapons or other hidden instruments that could be used for assault"). In short order, Barrett found a loaded Glock 40-caliber semi-automatic pistol and an unloaded nine millimeter semi-automatic pistol. He also found a second, loaded ammunition clip. Trooper Day found one full "dime bag" of marijuana in the course of her search of the van.

As to Rudolph's motion to suppress his statement ("The gun's on the back seat"), the judge found that Barrett's prior forceful question was motivated by his concern for his own safety, which the judge found was entirely justified, and was not an attempt to avoid the rights of any of the defendants. Having seen the loaded ammunition clip in the van — which conveyed the clear message that one or more guns were probably in the van —Barrett's question to Rudolph related "to an objectively reasonable need to protect the police. . . from any immediate danger associated with the weapon," thereby excusing his failure to give Miranda warnings. *New York* v. *Quarles*, 467 U.S. 649, 659 n.8 (1984). See *United States* v. *Eaton*, 676 F. Supp. 362, 365-366 (D. Me. 1988); *United States.* v. *Thurston*, 774 F. Supp. 666, 667-668 (D. Me. 1991), quoting from *United States* v. *Doe*, 878 F.2d 1546, 1552 (1st Cir. 1989). See also *Commonwealth* v. *Bourgeois*, 404 Mass. 61, 66 & n. 2 (1989), citing *New York* v. *Quarles*, 467 U.S. at 657, for the suggestion that objectively warranted concerns for police safety as well as for public safety might justify not applying the Miranda rule.

In this case, we hold that Barrett was not required to give the Miranda warnings before demanding to know where the guns were located. As we said in *Commonwealth* v. *Varnum*, *supra* at 576, quoting from *Commonwealth* v. *Robbins*, 407 Mass. 147, 152 (1990), "[p]olice officers are 'not required to gamble with their personal safety.' " We should not be "penalizing officers for asking the very questions which are the most crucial to their efforts to protect themselves and the public." *Quarles*, *supra* at 658 n.7.

Finally, the judge found that each defendant was informed of and understood his Miranda rights, and that the waiver by

each defendant of his Miranda rights was knowing, intelligently done, and voluntary, all beyond a reasonable doubt.

There was no error in the judge's denial of the defendants' motions to suppress.

*Discussion — the motion for a required finding.* The defendant Kitchings claims that the evidence was insufficient to permit a finding that he knowingly had in his possession, or knowingly had under his control in a vehicle, a firearm, loaded or unloaded, see G. L. c. 269, § 10.[10] The established standard of review is whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged. *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979).

"Possession implies control and power [citations omitted], exclusive or joint [citation omitted], or, in the case of 'constructive possession,' knowledge coupled with the ability and intention to exercise dominion and control [citations omitted]. Possession may often be inferred from proximity conjoined with knowledge; but the reasonableness of such an inference depends upon the circumstances." *Commonwealth* v. *Deagle,* 10 Mass. App. Ct. 563, 567-568 (1980).

Kitchings admitted to the police that he knew that the Glock semi-automatic pistol was in the van and that it was needed for protection during the trip north. The evidence also showed that the three defendants had been in the van together since they departed from South Carolina two days earlier, that Kitchings had driven the van a portion of the way, that his friend had rented it for him, and that he had slept in the van overnight in New York City. He slept between the seats behind the driver, where the weapons were found. These facts were sufficient to permit a reasonable jury to conclude beyond a reasonable doubt that Kitchings knowingly had in his possession, actual or constructive, or under his control in a

---

[10]Although Kitchings argues the sufficiency of the evidence as to all of the convictions, we do not review his convictions for possession of ammunition and marijuana which were placed on file. *Commonwealth* v. *Hrycenko,* 417 Mass. 309, 311-312 & n.2 (1994). *Commonwealth* v. *Mulero,* 38 Mass. App. Ct. 963 (1995).

vehicle, either alone or jointly with others, a loaded or unloaded firearm.

There was no error in the denial of the motion for a required finding of not guilty.

*Judgments affirmed.*