**Geoffrey C. LOCKETT, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 02A03–9905–CR–184.

Court of Appeals of Indiana.

Dec. 20, 1999.

Rehearing Denied Jan. 26, 2000.

P. Stephen Miller, Fort Wayne, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Teresa Dashiell Giller, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

----

1. Oral argument was heard in this case on November 16, 1999 at St. Joseph's High School in South Bend, Indiana.

## OPINION

KIRSCH, Judge

In this interlocutory appeal, Geoffrey Lockett challenges the trial court's denial of his motion to suppress evidence obtained by the State as the result of a warrantless search of the vehicle in which he was driving. Lockett raises the following issue for our review: whether a police officer may routinely ask a driver legitimately stopped for a traffic violation if he has a weapon in the vehicle or on his person. We hold that a police officer may not as a matter of routine practice make this inquiry.

We reverse.

### FACTS AND PROCEDURAL HISTORY[1]

In the early morning hours of October 2, 1998, Officer Jon Bonar and Officer Jeffrey Chang of the Fort Wayne Police Department were working the Saturation Patrol[2] on the south side of Fort Wayne when they observed Lockett's car driving erratically. Specifically, Bonar saw Lockett, the driver of the car, failing to signal as the car made several wide turns, varying the speed of the car in increments of between ten and fifteen miles per hour, using the entire roadway, and coming very close to cars parked on both sides of the street. After following the car for several blocks in his marked patrol car, Bonar stopped the car on the suspicion that the driver was impaired. Bonar also noticed that a passenger in the back seat of Lockett's car kept turning around to look at the pursuing patrol car. In addition to the back seat passenger, there was also a passenger seated in the front seat of the car.

Bonar exited his patrol car and went up to talk to the driver. Chang also exited

2. Bonar testified that the Saturation Patrol was a "high crime patrol" that watches for "any suspicious activities, vandalism, from burglary to anything in between." *Record* at 50.

the patrol car, but stood at the right front corner of the car. As Bonar approached the vehicle, Lockett rolled down the window, and Bonar detected a smell of alcohol emanating from the vehicle. Before asking Lockett for his identification, Bonar asked Lockett whether he had any weapons in the vehicle. Bonar asks this question of every individual he stops for safety reasons. Lockett did not respond to this question, but produced his identification card. Bonar asked Lockett to step out of the car in order to perform a field sobriety test and again asked him if he had any weapons on his person or in the vehicle. At this point, Lockett responded that he had a weapon under the front driver's seat. When Bonar looked down, he saw the gun. According to Bonar, once Lockett had exited the vehicle, the weapon was "sticking out underneath the front seat" and was "quite visible." *Record* at 60.

When questioned by Bonar about whether he had a permit for the gun, Lockett stated that he did and produced a permit. However, the permit was actually in Lockett's wife's name. Lockett then told Bonar that he did not have a permit in his own name. Bonar testified that if Lockett had produced a valid permit, the gun would have been returned to him, and Lockett would only have received a ticket for driving while suspended.

Lockett was subsequently charged with carrying a handgun without a license,[3] as a Class C felony. On March 8, 1999, Lockett filed a motion to suppress the handgun seized by Bonar during the traffic stop.

The trial court held a hearing on the motion to suppress on March 22, 1999. The trial court denied the motion. Lockett then petitioned the trial court to certify the order for an interlocutory appeal. The trial court certified the matter, stating the issue as "whether law enforcement officers may routinely ask a driver stopped for a traffic infraction if he has a weapon or firearm in the vehicle."[4] *Record* at 40. We accepted jurisdiction pursuant to Ind. Appellate Rule 4(B)(6).

## DISCUSSION AND DECISION

Lockett claims that Bonar's question about whether he had a weapon in the vehicle or on his person violates the Fourth Amendment to the United States Constitution and Article 1, § 11 of the Indiana Constitution. He does not challenge the constitutionality of the initial traffic stop. Rather, he contends that the officer's questioning about whether he possessed weapons in his vehicle or on his person after the initial stop was unconstitutional because it impermissibly expanded the scope of the original stop in violation of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Lockett relies on the rule established in *Terry* and later cases that for safety reasons a police officer may patdown a driver and vehicle, but prior to the patdown the officer must have a reasonable belief that the suspect is armed and dangerous. Lockett claims that Bonar did not reasonably believe that Lockett was armed and dangerous. Citing *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), Lockett also argues that because an inquiry following a stop must be reasonably related in scope to the justification for the stop, it is unconstitutional for an officer to routinely ask every individual whether they have a weapon.

The State in its brief does not directly address the issue of the constitutionality of a police officer's actions in routinely asking

---

3. *See* IC 35–47–2–1; IC 35–47–2–23.

4. Our supreme court noted in *Harbour v. Arelco, Inc.*, 678 N.E.2d 381 (Ind.1997) that Indiana Appellate Rule 4(B) refers to appeals from "interlocutory *orders*." *Id.* at 386 (emphasis in original). The court stated that "[t]he rule does not require or even permit certification of particular issues. Rather it requires certification of an interlocutory order.... Any issues that were properly raised in the trial court in ruling on the trial court's summary judgment order are available on interlocutory appeal." *Id.*

everyone he stops about the presence of weapons. Instead, the State argues that the trial court properly denied the motion to suppress because the evidence established that Bonar asked the question for purposes of officer safety. To support this argument, the State points to Bonar's testimony, which revealed the following: 1) the stop occurred at 2:20 a.m.; 2) the rear seat passenger turned around to look at the patrol car; 3) Lockett was stopped for impaired driving; and 4) Bonar once had to shoot a person during a traffic stop and had been stabbed during traffic stops. The State claims that "[i]t was reasonably prudent for Officer Bonar to confirm the absence or presence of weapons before proceeding with his investigation of [Lockett] as a possible drunk driver." *Appellee's Brief* at 6.

■ The trial court has broad discretion in ruling on the admissibility of evidence. *Drake v. State,* 655 N.E.2d 574, 575 (Ind.Ct.App.1995). We will reverse a trial court's ruling on the admissibility of evidence only when it has been shown that the trial court abused its discretion. *Carter v. State,* 692 N.E.2d 464, 465 (Ind.Ct.App.1997). A trial court's decision to deny a motion to suppress is reviewed as a matter of sufficiency. *Wilson v. State,* 670 N.E.2d 27, 29 (Ind.Ct.App.1996). Thus, in reviewing a trial court's decision on a motion to suppress, we do not reweigh the evidence or judge the credibility of witnesses, but determine if there was substantial evidence of probative value to support the trial court's ruling. *Whitfield v. State,* 699 N.E.2d 666, 668 (Ind.Ct.App. 1998), *trans. denied.* However, when evaluating determinations of reasonable suspicion, we accept the factual findings of the trial court unless they are clearly erroneous. *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996); *L.A.F. v. State,* 698 N.E.2d 355, 356 (Ind.Ct.App.1998). We review de novo the ultimate determination of reasonable suspicion. *Ornelas,* 116 S.Ct. at 1663; *L.A.F.,* 698 N.E.2d at 356.

■ The Fourth Amendment of the United States Constitution, as applied to the states by virtue of the Fourteenth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

U.S. Const. amend IV. Article One, Section Eleven of our state constitution contains an identical provision that protects persons against unreasonable searches and seizures. Both provisions have been interpreted to mean that searches and seizures that occur without prior judicial authorization in the form of a warrant are *per se* unreasonable, unless an exception applies. *Conwell v. State,* 714 N.E.2d 764, 766 (Ind. Ct.App.1999). The State bears the burden of proving that a warrantless search falls within one of the narrow exceptions to the warrant requirement. *State v. Friedel,* 714 N.E.2d 1231, 1237 (Ind.Ct.App.1999).

■ The *Terry* investigatory stop and frisk is one such exception to the warrant requirement. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court established the rule that the police can stop and briefly detain an individual for investigatory purposes if, based upon specific and articulable facts, the officer has a reasonable suspicion of criminal activity even if the officer lacks probable cause to make an arrest. To determine whether a seizure ("stop") and search ("frisk") are unreasonable, the Supreme Court established a two-part test: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19–20, 88 S.Ct. 1868. In discussing the scope of the search, the Court stated that "[t]he scope of the search must be 'strictly

tied to and justified by' the circumstances which rendered its initiation permissible." *Id.* at 19, 88 S.Ct. 1868 (quoting *Warden v. Hayden,* 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed.2d 782 (1967) (Justice Fortas, concurring)). The Supreme Court also defined the protective purpose of the patdown search:

> "Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

*Id.* at 27, 88 S.Ct. 1868. In summary, the Supreme Court concluded:

> "We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience thät criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

*Id.* at 30, 88 S.Ct. 1868.

The *Terry* rule and rationale have been extended to apply to traffic stops. *See Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (traffic stop more analogous to *Terry* stop); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (*Terry* principles applied to traffic stop to minimize dangers faced by law enforcement officers); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (police may order driver out of a vehicle during a stop for a traffic violation and frisk person for weapons if there is a reasonable belief that they are armed and dangerous); *Platt v. State,* 589 N.E.2d 222 (Ind.1992) (*Terry* applied in context of traffic stop). Under these holdings, once a vehicle is stopped for investigative purposes, an officer may conduct a search for weapons without obtaining a search warrant if the officer reasonably believes that he might be in danger. Furthermore, the police are entitled to conduct protective searches of passenger compartment of the stopped vehicle due to the inherent danger of roadside encounters:

> "Although *Terry* involved the stop and subsequent patdown search for weapons of a person suspected of criminal activity, it did not restrict the preventive search to the person of the detained suspect. Protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger. Roadside encounters between police and suspects are especially hazardous, and danger may arise from the possible presence of weapons in the area surrounding a suspect. Thus, the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the ra-

tional inferences from those facts, reasonably warrant the officer to believe that the suspect is dangerous and the suspect may gain immediate control of weapons."

*Michigan v. Long,* 463 U.S. at 1032, 103 S.Ct. 3469 (1983). *See also Broadus v. State,* 487 N.E.2d 1298, 1301 (Ind.1986).[5]

Ultimately, the scope of the search following a traffic stop is limited by whether the officer reasonably believes the suspect is armed and presently dangerous. An officer may be authorized to stop and question a suspect that he reasonably suspects is engaged in criminal activity, but the officer may not search the detainee unless the officer has a reasonable basis for believing that the person is in possession of a weapon. The United States Supreme Court in *Berkemer v. McCarty,* 468 U.S. at 439, 104 S.Ct. 3138 (citations omitted), discussed the scope of the questioning following a traffic stop:

> "[T]he usual traffic stop is more analogous to a so-called "Terry stop" than to a formal arrest. Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has com-

mitted, is committing, or is about to commit a crime, may detain that person briefly in order to investigate the circumstances that provoke suspicion. The stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions."

*See also State v. Harris,* 702 N.E.2d 722 (Ind.Ct.App.1998).

A reasonable investigation following a lawful traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose. *United States v. Ramos,* 42 F.3d 1160, 1163 (8th Cir.1994), *cert. denied,* 514 U.S. 1134, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995). If the officer's suspicions are raised in the course of such an investigation that unlawful activity may be involved, the officer may expand the scope of the stop to ask more intrusive questions unrelated to the original traffic violation. *Id.; see also United States v. $404,905.00 in U.S. Currency,* 182 F.3d

5. In *State v. Joe,* 693 N.E.2d 573, 575 (Ind.Ct. App.1998), *trans. denied,* we wrote:

> "Once a vehicle has been properly stopped for investigative purposes, an officer may conduct a search of the automobile's interior for weapons without first obtaining a search warrant if the officer reasonably believes that he or others may be in danger. *Gann v. State,* 521 N.E.2d 330, 333 (Ind. 1988); *Walker v. State,* 527 N.E.2d 706, 708 (Ind.1988), *cert. denied,* 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 118; *Jackson v. State,* 588 N.E.2d 588, 590 (Ind.Ct.App. 1992); *Castle v. State,* 476 N.E.2d 522, 524 (Ind.Ct.App.1985). The test for determining the reasonableness of an initial stop and a subsequent limited search for weapons as enunciated in *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1879–81, is whether the facts available to the officer at the moment of the seizure or the search would warrant a person of reasonable caution in believing that the action taken was appropriate. *Collett v. State,* 167 Ind.App. 185, 338 N.E.2d 286,

290 (1975). The purpose of a limited search for weapons after an investigative stop is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear for his safety or the safety of others. *Id.,* 338 N.E.2d at 291. An officer may only conduct a limited search for weapons when he has a reasonable belief that the suspect is armed and dangerous. *Id.* at 290–91. The police officer need not be absolutely certain that the individual is armed. *Id.* The issue is whether a reasonably prudent person in the same circumstances would be warranted in the belief that his safety or that of another was in danger. *Id.* In determining whether the police officer acted reasonably under the circumstances, due weight must be given, not to the officer's inchoate and unparticularized suspicions, but to the specific reasonable inferences which the officer is entitled to draw from the facts in light of his experience. *Id.*"

643, 647 (8th Cir.1999) (during traffic stop while police complete routine, but time-consuming tasks of computerized checks and writing up citation or warning, police may ask motorist routine questions such as destination, purpose of trip, or whether officer may search vehicle, and may act on whatever information is volunteered, but driver is not compelled to answer).

The question of whether a police officer may routinely question a person lawfully stopped for a traffic violation about the presence of weapons is a matter of first impression in Indiana. A review of cases in other jurisdictions that have addressed this question reveals that the issue has been analyzed under two different approaches: 1) officer safety rationale; or 2) question reasonably related to the reason for the stop. With the caveat from Judge Armstrong of the Oregon Court of Appeals that "the circumstances of individual cases make fact matching a fool's errand," the following is a synopsis of the relevant cases. *State v. Roe,* 154 Or.App. 71, 961 P.2d 228, 231 (1998) (Armstrong, J., dissenting).

In *Oregon v. Pope,* 150 Or.App. 457, 946 P.2d 1157 (1997), *review denied* (1998), the Oregon Court of Appeals held that an officer's expansion of a traffic stop to ask the defendant if he was carrying a weapon was justified by officer safety concerns. In *Pope,* the defendant was stopped for having an unlit taillight on his motorcycle by an officer who had recently attended a briefing about "outlaw biker gangs." At the time of the stop, the officer believed that Pope and the other motorcyclist with him were affiliated with a motorcycle gang. As the officer approached Pope, he asked if he was carrying any weapons. Pope responded that he had a knife in a sheath in his belt. After securing the knife, the officer asked Pope if he had any firearms. Pope said no. The officer then patted Pope down and found a loaded revolver inside his pocket. Pope was convicted of possession of a firearm. Under Oregon statute, an officer's actions during a traffic

stop are limited to "investigation reasonably related to the traffic infraction, identification and issuance of citation." ORS 810.410(3)(b). Thus, an officer may only investigate the infraction that triggered the initial stop unless there is some basis other than the infraction to broaden the scope of the investigation. The court held that although the officer clearly expanded the scope of the original traffic stop, the expansion was justified by legitimate concerns for officer safety. The fact that Pope was affiliated with a motorcycle gang was not by itself enough to provide reasonable suspicion that he posed a danger. Yet, the unusual manner in which both motorcyclists separated after getting off their motorcycles and the fact that the officer found a knife provided the additional justification.

Another relevant Oregon case is *State v. Roe,* 154 Or.App. 71, at 74–75, 961 P.2d 228, at 230, in which the Oregon Court of Appeals held that an officer's question about whether the driver, Roe, possessed a gun was within the latitude granted to the officer to provide for his safety based upon the circumstances. The officer noticed that Roe's vehicle had a license plate light that was not operating. The officer signaled for the vehicle to pull over, but before finally stopping, the driver passed by several places where he could have stopped. When the officer approached the vehicle, he saw bows and other hunting equipment in the back seat and a box of ammunition on the center console. He also smelled the odor of alcohol. The officer asked Roe if there was a gun in the vehicle, and Roe told him he had a gun under the driver's seat. The trial court denied Roe's motion to suppress, and he was convicted of unlawful possession of a firearm. On appeal, Roe claimed that the officer had no reason to fear for his safety merely because he saw a box of ammunition. The court stated the following rule:

"[A]n officer's inquiry for purposes of officer safety during a traffic stop does not violate ORS 810.410(3)(b) so long as

the inquiry is justified by a reasonable suspicion based on specific and articulable facts that there exists an immediate threat of harm to personal safety. Otherwise, an inquiry could impermissibly broaden the scope of the traffic stop and exceed the authority of the officer granted under the statute."

*Id.* at 74, 961 P.2d at 229 (citing *State v. Senn,* 145 Or.App. 538, 930 P.2d 874 (1996)). The court looked at the circumstances in which the officer found himself in order to determine the reasonableness of his inquiry. The following factors were relevant: the officer was alone in an isolated area at night after stopping a vehicle that had not immediately pulled over; the officer smelled alcohol; and he saw a box of ammunition within reach of the driver. The court held that the observation of the ammunition gave rise to a reasonable suspicion that Roe possessed a weapon, and this suspicion combined with the other circumstances gave rise to a reasonable suspicion that Roe could pose an immediate threat of serious physical injury.[6] *Id.* at 74–75, 961 P.2d at 230.

In *State v. Strawn,* 154 Or.App. 460, 463–464, 963 P.2d 34, 36 (1998), the Oregon Court of Appeals held that when a person was lawfully stopped as a suspect of a car burglary, the officer's question about whether he possessed any weapons was reasonably related to the purpose of the stop. Because car break-ins often are accomplished with weapons, it was reasonable for the officer to ask Strawn whether he possessed any weapons.

Illinois courts have also recently considered the issue before us. The Appellate Court of Illinois in *People v. Ross,* 289 Ill.App.3d 1013, 224 Ill.Dec. 526, 682 N.E.2d 87, 90 (1997), held that an officer's questioning a stopped motorist about whether he had a gun in the car after the motorist presented the officer with a firearm owner identification card did not impermissibly expand the scope of the traffic stop because there was a reasonable suspicion of the presence of a gun. In *Ross,* after officers stopped Ross for running a red light, he exited his car and met the two officers at the back of the car. When one of the officers asked Ross for his license and proof of insurance, Ross handed the officer a recent traffic ticket and a firearm owner identification card. After seeing the card, the other officer asked Ross if he had a gun in the car, and Ross responded affirmatively. A loaded pistol was found in the back seat.

On appeal, Ross claimed that the gun in the vehicle was entirely unrelated to the traffic offense for which he had been stopped, thus requiring suppression of the weapon. Applying the two-part *Terry* test, the court found the initial stop to be justified, and the officers' later actions in questioning Ross about whether he had a gun to be reasonably related to the circumstances which justified the stop. *Id.* The production of the firearm identification card created the type of articulable suspicion that would justify an extended *Terry* stop and questioning about whether there might be a gun in the car. *Id.* The card "created an independent basis upon which to continue and expand the officers' initial Terry stop." *Id.* When the officers received the card, it was reasonable for them to question him about the location of the gun he apparently owned. The court also noted that the officers were faced with a passenger inside the car who might have easy access to a gun in the car. The *Ross* court cited *People v. Dunlap,* 82 Mich.App.

---

6. Judge Armstrong in dissent believed that the officer's question was not justified by the circumstances. Citing *State v. Senn,* 145 Or. App. at 545, 930 P.2d 874 (no specific and articulable facts to support the concern for officer safety other than "furtive movements") and *State v. Knox,* 134 Or.App. 154, 894 P.2d 1185 (1995) (mere access to weapons does not give rise to a reasonable suspicion of an immediate threat), Armstrong believed that the facts of the case fell short of creating a reasonable belief that Roe posed a threat to the officer. *Id.* at 77, 961 P.2d at 231. Moreover, "the acknowledged fact that police officers face danger in conducting traffic stops" was not enough. *Id.*

171, 174–175, 266 N.W.2d 637, 639 (1978) (officer's questioning about location of gun was proper in context of traffic stop for speeding where officer saw car passenger with gunshot wound) and *Commonwealth v. Kitchings,* 40 Mass.App.Ct. 591, 666 N.E.2d 511 (1996) (officer's observation of ammunition clip in defendant's vehicle created concern for his safety and question about location of gun was therefore reasonable) as helpful in considering the reasonableness of the officers' conduct.

Notably, the court stated: "We leave for another day the question of whether officers may ask about such weapons in all traffic stops as a matter of routine." *Id.* (citing *People v. Edwards,* 158 Mich.App. 561, 405 N.W.2d 200 (1987) (officer's question about presence of gun to motorist lawfully stopped for failing to signal was not beyond the scope of the investigation of the routine traffic offense for purposes of *Miranda* and question legitimately related to the officer's concern for his safety)).

The New Mexico Court of Appeals recently held that the permissible scope of a traffic stop was exceeded by an officer who always asks whether stopped motorists have guns. *State v. Taylor,* 126 N.M. 569, 575, 973 P.2d 246, 252 (1998), *cert. denied,* 126 N.M. 534, 972 P.2d 353 (1999). In *Taylor,* an officer approached a parked car acting on a tip that the driver was just seen throwing trash out of the car, which looked like a car that had been used in a recent theft. After the first officer asked the men in the car for their identification, a second officer approached Taylor and asked him if he had any guns, alcohol, or illegal drugs. Taylor said no, and the officer requested consent to search the car. The search revealed a cigarette package located between the seat and console that contained crack cocaine. The court concluded that this questioning exceeded the scope of the stop. *Id.* "An officer may expand the scope of his detention beyond that which is reasonably related to the circumstances which justified his initial

stop only where the officer has reasonable and articulable suspicion that other criminal activity has been or may be afoot." *Id.* (citing *Terry,* 392 U.S. at 27, 88 S.Ct. 1868). As to the question about the drugs and alcohol, the court reasoned that they were unrelated to the purpose of the stop, which was to investigate littering and theft allegations. Similarly, the question about weapons did not reasonably relate in scope to the purpose of the initial stop. Moreover, there was no indication that the officer reasonably believed Taylor to be armed and dangerous. The court stated that the scope of a weapons search must be limited to its protective purpose. *Id.* at 577, 973 P.2d at 253. An officer's belief that a motorist is dangerous must be based on articulable facts before the belief is considered reasonable. *Id.*

We agree with the holdings in these cases that prior to making an inquiry about the presence of weapons the officer must: 1) either be warranted in believing that his safety was threatened; or 2) the question must reasonably relate to the basis for the traffic stop, such as may be the case after stopping a suspected armed burglar or bank robber. When an officer's safety is not at risk, then an officer may not as a matter of routine practice inquire about the presence of weapons. The police do not have a right to inquire about the presence of weapons without some reasonable and articulable basis for the question.

Applying this holding to the present case, we find that the Record fails to establish that Bonar's inquiry was based upon any specific and articulable facts that caused him to fear for his safety. At the hearing on the motion to suppress, Bonar testified that he had worked for the Fort Wayne Police Department for twelve years. He testified that he had made thousands of traffic stops, and his first concern when making a traffic stop was his safety. In response to the question whether there was any particular questions he asked of every individual that he stops, he

replied, "I ask if there are any weapons in the vehicle or you got any weapons on them." *Record* at 56. He stated that he is always concerned about his safety because he once had to shoot and kill a person during a traffic stop and he had been stabbed during traffic stops. Bonar testified that the question about weapons was "a standard question I ask anybody or any type of investigation, whether it be domestic, or whether there's any weapons in the house, anybody have access to a gun, knife, whatever." *Id.* at 70.

In order to justify a patdown, a police officer must articulate specific facts that caused him or her to fear for his or her safety because the suspect may be armed and dangerous. While the officer is not required to be absolutely certain that the suspect is armed, a general assertion that the frisk was conducted for purposes of officer safety is not sufficient. *See L.A.F.,* 698 N.E.2d at 356; *D.H. v. State,* 688 N.E.2d 221, 223 (Ind.Ct.App.1997). Similarly, standing alone a routine question about the presence of weapons posed to every person an officer stops is unconstitutional. We find nothing in the Record to justify Bonar's question to Lockett. The State suggests that the officer was fearful for his safety because it was late at night, the passenger turned around, and Bonar once had to shoot someone during a traffic stop. We find these justifications insufficient in light of Bonar's testimony that he asks this question of everybody. Although Bonar may have had a subjective fear for his safety given the prior incident of having to shoot someone, he offered no additional objective facts that caused him to believe that Lockett might be armed and dangerous. The fact that it was late at night and that a passenger turned around are not, standing alone, sufficient to cause a reasonable officer to fear for his safety under the circumstances. Additionally, nothing in the Record supports the inference that the routine asking of this question promotes officer safety.

Finally, the question posed by Bonar in no way related to the reason for the stop, which was based upon suspected drunk driving. Bonar testified that the purpose of the question was not to investigate the traffic violation. He stated that the question "had nothing to do with the stop." *Id.* at 74.

■ Having held that the question posed by Bonar to Lockett in this case impermissibly expanded the scope of the traffic stop, we now turn to the question of the admission of the weapon as a "fruit" of this illegality. As mentioned above, the State bears the burden of proving that the warrantless search falls within an exception to the warrant requirement. *See State v. Jorgensen,* 526 N.E.2d 1004, 1006 (Ind.Ct.App.1988). The State argued at the suppression hearing and in its appellee's brief that the search was justified solely based upon officer safety. The State's theory is that after Lockett responded affirmatively to the question about the presence of weapons that Bonar was justified in retrieving the gun for officer safety. While we agree that officer safety is a major concern, the fact remains that the Bonar's reason for retrieving the gun is inextricably bound to Lockett's answer to the illegal question. Further, the Record does not support any threat to officer safety until Lockett responded to Bonar's question that there was a gun under the seat. The State conceded at the suppression hearing that Bonar only discovered the weapon after Lockett told him the gun was under the seat. Because the State does not proffer an inevitable discovery argument or a plain view argument to sustain its burden, we hold that the gun must be suppressed as a fruit of the illegality. Accordingly, the trial court erred in denying the motion to suppress. Therefore, this case is remanded to the trial court with instructions to grant the motion to suppress.

Reversed and remanded.

DARDEN, J., and BROOK, J., concur.