Gregory FINGER, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0106–CR–389.

Court of Appeals of Indiana.

June 4, 2002.

Kathleen M. Sweeney, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Scott A. Kreider, Deputy Attor-

ney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROOK, Chief Judge.

### Case Summary

Appellant-defendant Gregory Finger ("Finger") appeals the trial court's order denying his motion to suppress evidence. We reverse.

### Issue

Finger raises one issue for review, which we restate as whether the trial court erred in denying Finger's motion to suppress evidence.

### Facts and Procedural History

On September 18, 2000, at around 10:30 p.m., Finger was sitting in the driver's seat of a car parked on the south curb of 56th Street near the intersection Meridian Street intersection in Indianapolis. Finger's companion, Michael Crosby ("Crosby"), was sitting in the passenger seat. Officer Richard Young ("Young") of the Butler Police Department received a dispatch stating that a concerned citizen had reported a suspicious vehicle located near the intersection of 56th and Meridian Streets.

Young drove to the intersection, parked his police cruiser behind Finger's car, and activated his emergency lights.[1] Young, who was in uniform, approached the car and asked Finger what was happening. Finger told Young that the car had run out of gas and that a passerby would soon be returning with more gas. Young made a quick glance at the gas gauge.[2] After obtaining identification from Finger and Crosby, Young returned to his police cruiser and ran a license check and warrant check, both of which came back negative. Instead of returning the identifications to Finger and Crosby, Young retained them.

After Young had been at the scene for five to ten minutes, two more Butler police officers arrived in one vehicle. Young told these officers that Finger and Crosby claimed to be out of gas.[3] One officer stood on the passenger side of the car, and at least two officers shone their flashlights into the car. The officers noticed a knife on the back seat and some ammunition on the front seat. Young asked about the knife and ammunition; Finger and Crosby replied that they did not know what the knife and ammunition were doing in the car or to whom the objects belonged. At the suppression hearing, Young testified that although this explanation made him suspicious, he had no indication that any crime had been or was being committed. Tr. at 25.

At this point the officers had Young and Crosby step out of the car. The officers then removed the knife and ammunition for their safety.[4] Young noticed a slight odor of alcohol about Finger. After the two Butler officers arrived, Young noticed that Finger and Crosby became nervous. At one point, Crosby apparently stated a

---

1. At the suppression hearing, Young testified, "I activated my emergency equipment being that this is at an intersection and approached the vehicle to ascertain if I could offer any assistance." Tr. at 6.

2. Young testified that he later looked at the gas gauge "more closely to confirm that—[he] had seen—the gas needle was not on empty." Tr. at 14. According to Young, the gas gauge registered approximately one-eighth (⅛) of a tank of gas. *Id.* at 15.

3. On cross-examination, Young acknowledged that he probably told the officers that he had run a license and warrant check. Tr. at 23.

4. Young testified that they might have searched the car for a handgun matching the ammunition. Tr. at 27.

different reason as to why he and Finger had parked there.[5]

Fifteen to twenty minutes after Young first arrived on the scene, and about ten minutes after his fellow Butler officers arrived, the officers overheard a call on an Indianapolis Police Department North District Channel that a robbery had just taken place. The robbery occurred at a liquor store at the southeast corner of North Illinois and 56th Streets, about one block away from where Finger and Crosby were parked. Based on the robbery call and the inconsistent explanations, the officers decided to detain Finger and Crosby and Mirandized them. At this point, about twenty minutes had elapsed since Young had arrived.

Young turned the investigation over to the Indianapolis Police Department ("IPD"). IPD officers brought the robbery victims to the scene. The victims identified Crosby, but not Finger, as having been involved in the robbery. The IPD officers found the identification card of a victim of a previous robbery inside the car. In addition, the perpetrators of both the previous robbery and this night's robbery had attempted to tie up the victims with shoelaces, and Finger was wearing tennis shoes with no shoelaces.

IPD Detective Delbert Shelton ("Shelton") transported Finger to police headquarters. Five hours after arriving at police headquarters, Finger gave a taped statement to Shelton.[6] Shelton detected an odor of alcohol on Finger's breath and some degree of physical impairment in Finger's walking. Finger told Shelton that he had been drinking, and Shelton believed that Finger was somewhat impaired at the time that he gave the taped statement.

On September 22, 2000, the State charged Finger with Class B felony conspiracy to commit robbery, two counts of Class B felony robbery, and two counts of Class B felony criminal confinement. On April 26, 2001, Finger filed a motion to suppress all evidence obtained through what he alleged was an illegal investigatory stop and detention due to a lack of "reasonable suspicion of criminal activity afoot." Appellant's App. at 54. He also moved to suppress his taped statement because his level of intoxication rendered it involuntary and unknowing. The trial court held a hearing on Finger's motion on May 4, 2001. Following the hearing, Finger moved to supplement the suppression record with the probable cause affidavit and police report, which motion was granted by the trial court.

On May 10, 2001, the trial court denied Finger's motion to suppress. In its ruling, the trial court found that Young's initial approach of Finger's car was not an investigatory stop, but rather an attempt to assist a motorist who may have been having car trouble.[7] The trial court further found that Young had "specific and articulable facts sufficient to give rise to a reasonable suspicion that a person had committed or was committing a crime." *Id.* at 96. The trial court's order reads in relevant part as follows:

47. The Court specifically finds that once Officer Young made the decision to detain the defendant, he considered the following which rises to the level of reasonable suspicion:

a. The defendant smelled of an odor of an alcoholic beverage;

---

5. This reason is not specified in the record.

6. The contents of Finger's statement are not included in the record or appendix.

7. Young testified that he had been dispatched to investigate "a suspicious vehicle with two subjects sitting inside the vehicle[.]" Tr. at 6.

b. That Officer Young heard a radio run that a robbery had been committed at the liquor store at 56th & Illinois by two black males;

c. That the defendant's car was located less than one block from the liquor store; and

d. That the information provided to Officer Young by the defendant and his passenger as to what they were doing in the area was inconsistent.

*Id.*

The trial court further found that the officers properly seized the knife and ammunition lying in plain view in the back seat of the car out of concern for their safety. The trial court also found that under the totality of the circumstances, Finger's taped statement was given voluntarily and intelligently. The trial court certified its order for interlocutory appeal,[8] and this court accepted jurisdiction.

### Discussion and Decision

Finger argues that the trial court erred in finding that Young approached Finger to assist him, and that Young did not make an investigatory stop. Finger claims that there were insufficient facts to support the requisite reasonable suspicion for an investigatory stop. Finger bases his claims on both Article I, Section 11 of the Indiana Constitution and the Fourth Amendment of the United States Constitution.[9]

8. In his appellate brief, Finger mistakenly asserts that this court has "jurisdiction of this [interlocutory appeal] pursuant to Ind. Appellate Rule 4(B)(6)." Appellant's Br. at 1. Under the current rules of appellate procedure, effective January 1, 2001, this court has "jurisdiction over appeals of interlocutory orders under [Appellate] Rule 14." Ind. Appellate Rule 5(B).

9. We do not reach Finger's Indiana constitutional claim because we find Fourth Amendment jurisprudence dispositive of the issue.

The State argues that the trial court properly denied Finger's motion to suppress because Young did not stop the car but was responding to a call about a suspicious vehicle that was supposedly out of gas.[10] The State claims that "during the investigation reasonable suspicion developed," Appellee's Br. at 4, and that therefore the trial court did not abuse its discretion in denying Finger's motion to suppress.

### A. Standard of Review

 We review the denial of a motion to suppress in a manner similar to other sufficiency matters. We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. However, unlike the typical sufficiency of the evidence case where only the evidence favorable to the judgment is considered, we must also consider the uncontested evidence favorable to the defendant.

*Overstreet v. State,* 724 N.E.2d 661, 663 (Ind.Ct.App.2000) (citations omitted).

### B. Fruit of the Poisonous Tree

 "Evidence seized illegally or obtained as a result of an illegal seizure by a government agent is not directly admissible in a criminal or quasi-criminal proceeding against a person whose expectation of privacy was violated by the illegal seizure." *C.D.T. v. State,* 653 N.E.2d 1041, 1044–45 (Ind.Ct.App.1995).

10. To the extent that the State implies that Young knew that the car was out of gas when he responded to the call, this interpretation of the facts is somewhat skewed. The record does not indicate that the concerned citizen reported the car as anything more than suspicious, and certainly not that the car was out of gas. Rather, the record clearly indicates that Young did not learn that the car was supposedly out of gas until he began questioning Finger.

The "fruit of the poisonous tree" doctrine is one facet of the exclusionary rule of evidence which bars the admissibility in a criminal proceeding of evidence obtained in the course of unlawful searches and seizures. When applied, the doctrine operates to bar not only evidence directly obtained, but also evidence derivatively gained as a result of information learned or leads obtained during an unlawful search or seizure. To invoke the doctrine, a defendant must show that challenged evidence was obtained by the State in violation of the defendant's Fourth Amendment rights. Stated differently, the defendant must show that the search or seizure was illegal in the first instance. Where there is no illegal search or seizure, there can be no "fruit of the poisonous tree."

*Hanna v. State,* 726 N.E.2d 384, 389 (Ind. Ct.App.2000).

### C. Three Levels of Police Investigation

 There are three levels of police investigation. *Overstreet,* 724 N.E.2d at 663. Two of these, an investigatory stop and an arrest or detention, implicate the Fourth Amendment's prohibition against unreasonable searches and seizures. *See id.* The third, a consensual encounter, does not. *Id.*

First, the Fourth Amendment requires that an arrest or detention for more than a short period be justified by probable cause. Probable cause to arrest exists where the facts and circumstances within the knowledge of the officers are sufficient to warrant a belief by a person of reasonable caution that an offense has been committed and that the person to be arrested has committed it. Second, it is well-settled Fourth Amendment jurisprudence that police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if,

based on specific and articulable facts, the officer has a reasonable suspicion that criminal activity "may be afoot." Accordingly, limited investigatory stops and seizures on the street involving a brief question or two and a possible frisk for weapons can be justified by mere reasonable suspicion. Finally, the third level of investigation occurs when a law enforcement officer makes a casual and brief inquiry of a citizen which involves neither an arrest nor a stop. In this type of "consensual encounter" no Fourth Amendment interest is implicated.

*Id.* (citations omitted).

 What begins as a consensual encounter may evolve into an investigatory stop. *See Bovie v. State,* 760 N.E.2d 1195, 1198 (Ind.Ct.App.2002). "In a consensual encounter, the individual remains free to disregard the police officer and to walk away. Only when an individual no longer remains free to leave does an investigatory stop begin." *Id. See also Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").

 The United States Supreme Court has held that "in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). This is an objective test: the proper inquiry is "not whether the citizen perceived that he was being

ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *see also Knowles v. State,* 571 N.E.2d 1308, 1311 (Ind.Ct.App.1991).

Examples of circumstances under which a reasonable person would have believed he was not free to leave include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Overstreet,* 724 N.E.2d at 664.

### D. Retention of Finger's Identification

Early in the course of the encounter, Young requested Finger's identification. Young then returned to his cruiser and ran a license and warrant check. After learning that Finger's license was valid and that he had no outstanding warrants, Young returned to the parked car and continued questioning Finger and Crosby. Instead of returning the identification to Finger, however, Young retained it. The inquiry here is whether, in light of all of the circumstances (including Finger's explanation that the car was out of gas), a reasonable person would feel free to leave when a police officer retains his or her license.

While we have found no Indiana cases dealing specifically with a police officer's retention of a driver's license in the consensual encounter context, other jurisdictions have concluded that a reasonable person would not feel free to leave when a police officer retains his or her identification. In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the Supreme Court stated that a defendant in an airport could not, as a practical matter, leave the airport because the defendant's ticket and identification had been seized and retained by the police, and the police had taken the defendant's luggage. *Id.* at 504 n. 9, 103 S.Ct. 1319. The *Royer* court distinguished the case from *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), in which the court determined that a law enforcement agent's questioning of the defendant in an airport was a consensual encounter:

Here, Royer's ticket and identification remained in the possession of the officers throughout the encounter; the officers also seized and had possession of his luggage. As a practical matter, Royer could not leave the airport without them. In *Mendenhall,* no luggage was involved, the ticket and identification were immediately returned, and the officers were careful to advise that the suspect could decline to be searched. Here, the officers had seized Royer's luggage and made no effort to advise him that he need not consent to the search.

*Id.*

The Seventh Circuit Court of Appeals considered three airport drug courier cases in the wake of the Supreme Court's *Royer* decision. In *United States v. Cordell,* 723 F.2d 1283 (7th Cir.1983), *cert. denied* (1984), the court stated:

When officers O'Connor and Abreu identified themselves as police officers, asked Cordell if he would speak to them, and requested his identification and airline ticket, they were doing nothing that could be construed as a Fourth Amendment seizure unless one views all encounters between the police and citizens as seizures requiring justification, and we do not.

However, when O'Connor handed Cordell's driver's license and airline tick-

et to Abreu, and told Cordell they were conducting a narcotics investigation, the encounter had become a detention.

*Id.* at 1285. Two years later, in *United States v. Borys,* 766 F.2d 304 (7th Cir. 1985), *cert. denied* (1986), the court stated, "Officers' retaining airline tickets and driver's licenses has been a crucial factor in finding that a seizure has occurred. Suspects deprived of their ticket and identification are effectively deprived of the practical ability to terminate the questioning and leave." *Id.* at 310. Finally, in *United States v. Soto–Lopez,* 995 F.2d 694 (7th Cir.1993), the court held that the circumstances "did not rise above the level of a consensual encounter" when one police officer took notes as another police officer read the information from the driver's license. *Id.* at 699. "When an officer merely *glances* at a ticket, it does not amount to a seizure." *Id.* (emphasis in original).

The Eleventh Circuit Court of Appeals analogized airplane tickets and driver's licenses in the Fourth Amendment context. In *United States v. Thompson,* 712 F.2d 1356 (11th Cir.1983), a police officer approached a car parked in long-term parking at the Jacksonville Airport in Florida. *See id.* at 1358. As he approached, the officer noticed that the driver had an object held to his nose. *Id.* The driver moved the object quickly to his side when he noticed the officer. *Id.* The officer asked the driver for identification. *Id.* The driver produced his driver's license. *Id.* The officer retained the license while he continued to question the driver. *Id.* The court stated,

> The cases holding that a *Terry*-type stop occurs where law enforcement officers retain a person's airline ticket are controlling. In a purely physical sense, the retention of a person's airline ticket does not prevent him from leaving the company of law enforcement agents.

He may, if he has sufficient funds, attempt to purchase another ticket and depart to his chosen destination. Or he may simply try to walk away, abandoning his plans to travel by air. But the cases . . . hold that despite physical possibility of departure, a reasonable person whose airline ticket has been retained would not believe that the officers would permit him to depart.

> As in the airline ticket cases, the person whose driver's license has been retained can, in a physical sense, attempt to leave the scene. He can abandon his vehicle and walk away, or attempt to drive away. As the airline ticket cases hold, however, the legal issue is whether a reasonable person would believe that law enforcement officers would permit him to leave. Contrasted with a person whose airline ticket has been retained, a person in a car whose license has been retained has less reason to expect that he will be permitted to leave. While a person may theoretically purchase another airline ticket and proceed on his way, a driver whose license has been retained may drive away only at the risk of arrest. Thus, the airline ticket cases reinforce, if not compel, our conclusion that a driver whose license has been retained would not reasonably believe himself free to leave.

*Id.* at 1360–61.

Finally, in *United States v. Jordan,* 958 F.2d 1085 (D.C.Cir.1992), where police officers stopped Jordan as he prepared to climb into his car and asked to see his identification, the court held that "what began as a consensual encounter between [the police officer] and Jordan graduated into a seizure when the officer asked Jordan's consent to a search of his bag, after he had taken and still retained Jordan's driver's license." *Id.* at 1088.

These cited authorities establish that a consensual encounter becomes an investigatory stop under the Fourth Amendment when a law enforcement agent retains an individual's driver's license or other identification. Under the facts of the instant case, we need not determine the precise moment at which Young's retention of Finger's identification transformed the consensual encounter into an illegal investigatory stop because Young retained Finger's identification long before the reasonable suspicion required to conduct a legal investigatory stop developed. We therefore reverse the trial court's order denying Finger's motion to suppress the evidence obtained from the illegal stop and Finger's subsequent statement to police.

Reversed.

RILEY, J., and MATHIAS, J., concur.