**STATE of Indiana, Appellant–Plaintiff,**

v.

**Robert BULINGTON, Appellee–Defendant.**

**No. 79A04–0206–CR–261.**

Court of Appeals of Indiana.

Feb. 12, 2003.

---

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

E. Kent Moore, Lafayette, IN, Attorney for Appellee.

## OPINION

BROOK, Chief Judge.

### Case Summary

Appellant-plaintiff State of Indiana appeals the trial court's grant of a motion to

suppress filed by appellee-defendant Robert Bulington ("Bulington"). We reverse and remand.

### Issues

The State raises a single issue for review, which we restate as the following two:

I. whether the investigatory stop of Bulington's truck was proper; and

II. whether Bulington freely and voluntarily consented to the warrantless search of his truck.

### Facts and Procedural History

At approximately 10:00 p.m. on December 11, 2001, team leader Cassie Oakley ("Oakley") of the Meijer Superstore in Lafayette saw two men standing in the nasal decongestant area of the health and beauty department. Meijer's loss-prevention department had previously advised Oakley to "kind of watch people that are looking at" precursors of methamphetamine such as "nasal decongestants and Sudafed and things like that[.]" Tr. at 6. When the two men declined Oakley's offer of assistance, she telephoned store detective Dan Majors ("Majors") in Meijer's loss-prevention department and informed him that the men were "looking at the nasal decongestants[.]" *Id.*

The Tippecanoe County drug task force had previously asked Meijer employees to call the Lafayette Police Department ("the LPD") "every time" they saw someone purchase "three boxes or more of cold medicine, antihistamines, Robitussin," or "lithium batteries, fuel, any of the precursors for the manufacture of methamphetamines[.]" *Id.* at 11. Using a closed-circuit camera, Majors saw one of the men select three boxes of ephedrine and quickly leave the area. Majors then saw the second

man select three boxes of ephedrine. The two men purchased only the ephedrine at different cash registers and "proceeded to act like they weren't together." *Id.* at 15.

After the first man left with his purchase, Majors called the LPD and notified a dispatcher that the two men had purchased only three boxes of ephedrine[1] apiece at different cash registers. While observing the men with in-store and outside cameras, Majors reported to the dispatcher that they left the store separately, entered the same truck, and removed the tablets from the boxes and put them into Meijer shopping bags. The dispatcher simultaneously relayed this information to Officer Anthony McCoy ("McCoy"), who had received training regarding the precursors necessary to manufacture methamphetamine.

McCoy responded to the dispatch and entered the Meijer parking lot as the truck was about to exit the lot. Via the dispatcher, Majors confirmed that the two men were in this truck. McCoy followed the truck out of the parking lot, onto State Road 26, and into a restaurant parking lot. After the truck pulled into a parking space, McCoy activated the emergency lights on his marked police vehicle. Officer Cheever arrived in his own marked vehicle, and the two officers approached the truck.

McCoy spoke with Bulington, the driver, who was "very nervous" and "visibly shaking[.]" *Id.* at 32. McCoy asked Bulington to exit the truck and requested his driver's license and registration. McCoy retained these items and asked Bulington about his purchase of the ephedrine at Meijer. Bulington responded, "[T]hat's what she told me to buy." *Id.* at 36. Bulington consented to McCoy's request to perform a pat-

---

**1.** Ephedrine is one of the chemical reagents or precursors of methamphetamine listed in

Indiana Code Section 35–48–4–14.5(a). *See* Ind.Code § 35–48–4–14.5(a)(1).

down search of his person, which yielded no weapons. McCoy then asked if he could search the truck. Bulington shook his head yes; when McCoy asked for clarification, Bulington responded that the officers could search the truck. McCoy asked Bulington to stand near Officer Bob Brown, who had also responded to the dispatch.

Inside the truck, McCoy found a Meijer shopping bag containing six empty Meijer-brand packages of ephedrine; an Osco bag containing what appeared to be hundreds of "one milligram ephedrine pills" and six unopened foil packs of pills; a Super Target bag containing, among other items, an eleven-ounce can of an ether-containing substance;[2] a plastic tube with tape on one end; a piece of aluminum foil with charring on one side and residue on the other; and two four-packs of lithium batteries.[3] *Id.* at 37–38.

On January 3, 2002, the State charged Bulington with Class B felony conspiracy to commit dealing in methamphetamine;[4] Class D felony possession of two or more chemical reagents or precursors with intent to manufacture methamphetamine;[5] and Class D felony maintaining a common nuisance.[6] On February 11, 2002, Bulington filed a motion to suppress the evidence seized as a result of McCoy's stop and search of his truck.

On April 1, 2002, the trial court held a hearing on Bulington's motion. On April 23, 2002, the trial court entered numerous detailed findings and conclusions and issued the following order:

The Court finds that the defendant was not violating any traffic laws prior to being pulled over by the officers on this "traffic" stop. The Court is judging the reasonableness of this investigatory stop by attempting to strike a balance between the public interest and the individual's right to personal security free from arbitrary interference by law enforcement. The Court now concludes that this "traffic" stop is defective under the totality of the circumstances under both the United States Constitution and the Indiana Constitution since the investigatory stop was based solely on a tip made by a cooperative citizen based upon a profile (purchase of three boxes of cold medicine) and where there was no crime or traffic violation committed in the officers' presence. The Court finds the State failed to bear its burden of establishing that the consent to search the vehicle was made voluntarily. The defendant's Motion to Suppress is now granted.

*Id.* at 60. The State now appeals.[7]

### Discussion and Decision

 At the hearing on Bulington's motion to suppress,

---

2. According to the transcript, McCoy described this substance as "Snap starting food[.]" Tr. at 38. We presume that McCoy actually referred to starting *fluid*. *See Iddings v. State,* 772 N.E.2d 1006, 1011 (Ind.Ct.App. 2002) (noting that police "found extensive evidence of a methamphetamine lab" in defendant's garage, including "over sixty cans of engine starting fluid"), *trans. denied.* Ether is another chemical reagent or precursor of methamphetamine. *See* Ind.Code § 35–48–4–14.5(a)(10).

3. Lithium metal is also a chemical reagent or precursor of methamphetamine. *See* Ind. Code § 35–48–4–14.5(a)(8).

4. Ind.Code §§ 35–48–4–2 (dealing in a schedule II controlled substance), 35–41–5–2 (conspiracy).

5. Ind.Code § 35–48–4–14.5.

6. Ind.Code § 35–48–4–13.

7. On October 22, 2002, our court prematurely issued an opinion in which a majority of this

the State had the burden of demonstrating the constitutionality of the measures it used to secure evidence. In order to prevail on appeal, the State must show that the trial court's ruling on the suppression motion is contrary to law. This court accepts the factual findings of the trial court unless they are clearly erroneous. In reviewing the trial court's decision, we consider the evidence most favorable to the ruling together with any adverse evidence that is uncontradicted.

*State v. Glass*, 769 N.E.2d 639, 641 (Ind. Ct.App.2002) (citations and footnote omitted), *trans. denied.*[8]

### I. Investigatory Stop

The State argues the propriety of McCoy's investigatory stop of Bulington's truck under the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Indiana Constitution. We address each argument in turn.

#### A. Fourth Amendment of United States Constitution [9]

■ The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures" by the Government, and its safeguards extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. However, a police officer may briefly detain a person for investigatory purposes without a warrant or probable cause if, based upon specific and articulable facts together with ra-

tional inferences from those facts, the official intrusion is reasonably warranted and the officer has a reasonable suspicion that criminal activity "may be afoot." *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Cases recognize that reasonable suspicion is a "somewhat abstract" concept, not readily reduced to "a neat set of legal rules." When making a reasonable-suspicion determination, reviewing courts examine the "totality of the circumstances" of the case to see whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. The reasonable suspicion requirement is met where the facts known to the officer at the moment of the stop, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur.

*Id.* at 641–42 (some citations omitted).

Chief Justice Burger elaborated upon the concept of a "particularized and objective basis" in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981):

An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.

Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to

---

panel affirmed the trial court's ruling on Bulington's motion to suppress. We vacated this opinion one week later.

8. In stating the applicable standard of review, Bulington relies on this court's opinion in *Lockett v. State*, 720 N.E.2d 762 (Ind.Ct.App. 1999), which our supreme court subsequently vacated. *See Lockett v. State*, 747 N.E.2d 539 (Ind.2001).

9. The Fourth Amendment of the United States Constitution provides,

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the places or things to be seized.

stop a person. Terms like "articulable suspicion" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio, supra,* said that, "[t]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*"

*Id.* at 417–418, 101 S.Ct. 690 (footnote and citations omitted).

 "A reasonable suspicion justifying a limited [investigatory] stop of a vehicle affords a police officer the right to temporarily 'freeze' the situation in order to make investigative inquiry." *Bogetti v. State,* 723 N.E.2d 876, 879 (Ind.Ct.App. 2000). "Reasonable suspicion entails something more than an inchoate and unparticularized suspicion or hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence. Consideration of the totality of the circumstances necessarily includes a determination of whether the defendant's own actions were suspicious." *Crabtree v. State,* 762 N.E.2d 241, 246 (Ind.Ct.App.2002). "In judging the reasonableness of investigatory stops, courts must strike a balance between the public interest and the individual's right to personal security free from arbitrary interference by law enforcement officers." *Bogetti,* 723 N.E.2d at 878. "We review the trial court's ultimate determination regarding reasonable suspicion de novo." *Glass,* 769 N.E.2d at 642.

At the suppression hearing, McCoy acknowledged that he was dispatched to Meijer "in reference to two males purchasing the maximum quantity of ephedrine" [10] and

---

**10.** McCoy was the only witness at the suppression hearing to testify that the medication at issue contained ephedrine. *See* Tr. at 32 ("I had information from Meijer[ ] that they

testified that while he was en route, the dispatcher

> was in contact with somebody from Meijer[ ], a representative of Meijer[ ] the entire time we were there and they were giving—kind of giving us the low down or the play by play so to speak of the two gentlemen who had bought [the ephedrine], where they were out, now they're sitting in their vehicle, and that sort of thing until my arrival.

Tr. at 30, 31. Although there is no indication that McCoy was acquainted with Majors or knew his name,[11] he did know that the informant was a Meijer employee and was able to confirm that he was following Bulington's truck out of the Meijer parking lot.

■ Bulington correctly observes that reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Ephedrine is a chemical reagent or precursor of methamphetamine listed in Indiana Code Section 35–48–4–14.5(a). Under subsection (c) of this statute, the possession of two or more such chemical reagents or precursors with the intent to manufacture methamphetamine is a Class D felony. At the time McCoy stopped Bulington's truck, he knew only that the driver and his companion possessed a single methamphetamine precursor. Buling-

ton claims that he "went to a store and made a legitimate purchase of three packages of cold medicine. The fact that [his companion] made a similar purchase raises no inference that the purpose of the purchase is to manufacture methamphetamine." Appellee's Br. at 16.

We must disagree. The Tippecanoe County drug task force had asked Meijer employees to notify the LPD if a customer purchased certain quantities and/or combinations of a methamphetamine precursor or precursors.[12] Majors informed the police dispatcher that both Bulington and his companion had purchased only three boxes of ephedrine at different cash registers, left the store separately, and got into the same truck. It was reasonable for McCoy to infer that the two men knew of (or at least suspected the existence of) Meijer's policy of alerting authorities to the purchase of certain quantities and/or combinations of methamphetamine precursors and that they had attempted to purchase one such precursor in a manner calculated to avoid suspicion. *See Cortez*, 449 U.S. at 418, 101 S.Ct. 690 (explaining that "an assessment of the whole picture" includes "consideration of the modes or patterns of operation of certain kinds of lawbreakers"); *see also Luster v. State*, 578 N.E.2d 740, 743 (Ind.Ct.App.1991) ("A series of acts taken together, each of them perhaps innocent if viewed separately, could warrant investigation.").

---

had purchased the maximum amount of ephedrine, packs of ephedrine, there were two individuals who had purchased the maximum amount...."). Oakley testified that the two men were looking at "nasal decongestants," *id.* at 6, and Majors referred to the medication variously as "cold medicine" or "antihistamine." *Id.* at 14–15.

**11.** Contrary to the State's suggestion, the record does not indicate that McCoy knew that Majors was a "store loss prevention officer[.]" Appellant's Br. at 7.

**12.** This is not the first time that our court has encountered such a policy. *See Dolkey v. State*, 750 N.E.2d 460, 461 n. 2 (Ind.Ct.App. 2001) ("According to [a Vanderburgh County Wal–Mart store's loss prevention associate], the store's loss prevention department notifies authorities as a standard operating procedure when a customer purchases three boxes of pseudoephedrine tablets or other 'maximum amount[s]' of specific precursor[s]' of methamphetamine.").

Under the totality of these circumstances, we conclude that Majors's information was sufficiently reliable to provide McCoy with reasonable suspicion that Bulington and his companion were, or were about to be, engaged in criminal activity, i.e., that Bulington and his companion possessed, or were about to possess, two or more chemical reagents or precursors with the intent to manufacture methamphetamine. *Compare State v. Eichholtz,* 752 N.E.2d 163, 166 (Ind.Ct.App.2001) (holding that officer had reasonable suspicion to stop intoxicated driver without personally observing erratic driving or traffic violations where eyewitness following driver gave name and description of his car to dispatcher; "[The eyewitness] identified himself to the 9–1–1 operator in a manner that he could be held legally responsible if [the officer's] investigation indicated that [the eyewitness] filed a false police report.") *and Bogetti,* 723 N.E.2d at 878–80 (holding that officer had reasonable suspicion to stop suspected intoxicated driver solely on basis of face-to-face encounter with unidentified "concerned citizen" who informed officer that truck driver who had just driven away from restaurant " 'may be intoxicated' "; "Finally, we note that anonymous or unidentified informants can supply information that gives police reasonable suspicion. A tip will be deemed reliable when an individual provides specific information to police officers such as a vehicle description.") *with Glass,* 769 N.E.2d at 643 (holding that officer did not have reasonable suspicion to stop suspected reckless driver without personally observing traffic violations or inappropriate driving where "at the time of the stop, [the officer] did not know whether the caller [who alerted the dispatcher] was a concerned citizen, a prankster, or an imposter. Further, we cannot discern whether the caller identified himself in such a way as to place his credibility at risk or to subject himself to criminal penalties.") *and Washington v. State,* 740 N.E.2d 1241, 1243–46 (Ind.Ct.App.2000) (holding that officer did not have reasonable suspicion to stop "possible drunk driver" without personally observing "evidence of drunken or erratic driving" where officer relied solely on tip from anonymous informant who gave description, direction, and license plate number of car; "We accordingly hold that an anonymous telephone tip, absent any independent indicia of reliability or any officer-observed confirmation of the caller's prediction of the defendant's future behavior, is not enough to permit police to detain a citizen and subject him or her to a *Terry* stop and the attendant interruption of liberty required to accomplish it."), *trans. denied* (2001); *see also Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."). The trial court's ruling on this issue is contrary to law.

### B. Article I, Section 11 of Indiana Constitution [13]

The federal constitution applies to the states through the provisions

---

**13.** Article I, Section of the Indiana Constitution provides,

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

of the fourteenth amendment, which prohibit a state from falling below certain minimal standards. However, Indiana courts have the responsibility of independent constitutional analysis, and the Indiana Constitution may offer protections more extensive than those provided by its federal counterpart. We have interpreted the protections provided by Article I, § 11 of the Indiana Constitution regarding investigatory stops to be consistent with federal interpretation of the protections provided by the Fourth Amendment to the United States Constitution.

*Washington,* 740 N.E.2d at 1246 (citations omitted). "In resolving challenges asserting this section, courts must consider the circumstances presented in each case to determine whether the police behavior was reasonable. We require the State to bear the burden of showing that, in the totality of the circumstances, the intrusion was reasonable." *Mitchell v. State,* 745 N.E.2d 775, 786 (Ind.2001) (citations and quotation marks omitted).

To reiterate, McCoy received information from a Meijer employee that both Bulington and his companion had purchased only three boxes of ephedrine [14] at

different cash registers, left the store separately, and got into the same vehicle. McCoy reasonably could have inferred from Majors's running commentary of the pair's activities that they had attempted to purchase a single methamphetamine precursor in a manner calculated to avoid suspicion. Under the totality of the circumstances, we conclude that it was reasonable for McCoy to conduct an investigatory stop of Bulington's truck to determine whether he and his associate had engaged or were about to engage in the criminal activity of possessing two or more methamphetamine precursors with the intent to manufacture methamphetamine.[15] The trial court's ruling on this issue is contrary to law.

Having reached this conclusion, however, we must admit that we are deeply troubled by unwritten store "policies" specifying a seemingly arbitrary quantity of certain household items that customers may purchase without coming under suspicion. We are similarly troubled by the prospect of authorities acting on tips from improperly trained or overly zealous store employees [16] in investigating the spreading scourge of methamphetamine manufacture.[17]

---

14. The State characterizes six boxes of ephedrine as a "large quantity" of the substance. Appellee's Br. at 6. There is no basis in the record for concluding that six boxes containing an unknown quantity of tablets with an unknown concentration of ephedrine is a "large quantity" of ephedrine. The critical factor in our analysis is the reasonableness of the inference that Bulington and his companion knew or suspected the existence of Meijer's policy of alerting authorities to the purchase of a certain quantity of methamphetamine precursors and that they attempted to purchase the ephedrine in a manner calculated to avoid suspicion.

15. We are not concerned here with the purchase of three boxes of ephedrine by a single customer who simply enters and exits the store alone. Such a purchase might well

have prompted Majors to alert the authorities; without more, however, it would not necessarily give rise to a reasonable suspicion of criminal activity sufficient to justify an investigatory stop. Nothing would prohibit an officer, however, from conducting a less intrusive investigation to determine whether the ephedrine purchaser might subsequently purchase additional precursors at other stores with the intent to manufacture methamphetamine.

16. At the suppression hearing, Majors acknowledged that he would call the LPD if a customer purchased only one tank of propane fuel or duct tape. *See id.* at 21–22.

17. *See* National Drug Intelligence Center, Indiana Drug Threat Assessment (April 2001) ("Methamphetamine production is increasing,

Nevertheless, we cannot ignore that, unlike illegal drugs derived from coca or opium, methamphetamine can be easily manufactured using raw materials and equipment that (with the exception of anhydrous ammonia)[18] are readily available in any drugstore or general retail store.[19] As a consequence, thousands of purchases of otherwise "innocent" household items in certain quantities and combinations that once would have been made without notice or comment now result in heightened surveillance and criminal investigation.[20] Faced with this disturbingly Orwellian reality, both the courts and the civil authorities must ensure that Indiana's laws against methamphetamine manufacture are enforced in a manner that does not unreasonably infringe upon the privacy rights of Hoosiers guaranteed by the state and federal constitutions.

## II. Consent to Search Truck

We now address the legality of McCoy's search of Bulington's truck. Both the Fourth Amendment and Article I, Section 11 protect against unreasonable searches of a person's effects, including automobiles. *See Ammons v. State,* 770 N.E.2d 927, 930–31 (Ind.Ct.App.2002), *trans. denied.* Under the Fourth Amendment, "[a] search conducted without a warrant issued upon probable cause is *per se* unreasonable." *State v. Jorgensen,* 526 N.E.2d 1004, 1005 (Ind.Ct.App.1988) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). "This rule is subject only to a few established and well-delineated exceptions.

---

especially in rural areas. The Indiana State Police Clandestine Laboratory Entry Team seized 128 methamphetamine laboratories in 1999 and 427 laboratories in 2000."), http://www.usdoj.gov/ndic/pubs/660/meth.htm; *see also* Terry Horne, *More meth labs dismantled by State Police,* INDYSTAR.COM (Indianapolis, Indiana) (January 8, 2003) (noting that the Indiana State Police seized 546 methamphetamine laboratories in 2001 and 732 laboratories in 2002), http://www.indystar.com/print/ articles/6/014311–9636– P.html; Seth Slabaugh, *Secret meth labs pop up in East Central Indiana,* THE STARPRESS.COM (Muncie, Indiana) (July 15, 2001) (noting that methamphetamine laboratories "have been found in more than 70 of Indiana's 92 counties"), ht tp://www.thestarpress.com/tsp/macros/series/stories/ 0715sermethlabday1.php.

18. *See* Seth Slabaugh, *Meth labs a threat to police, firefighters, EMTs,* THESTARPRESS.COM (Muncie, Indiana) (July 16, 2001) (noting that the only product used by methamphetamine manufacturers "that isn't available in stores is liquid anhydrous ammonia, an agricultural fertilizer."), http://thestarpress.com/tsp/ macros/series/stories/ 0716sermethlabs2.php. "Anhydrous ammonia or ammonia solution (as defined in IC 22–11–20–1)" are listed as chemical reagents or precursors of methamphetamine under Indiana Code Section 35–

48–4–14.5(a)(5). *See* Ind.Code § 22–11–20–1 ("As used in this chapter, 'ammonia solution' means any ammonia solution that contains at least ten percent (10%) by weight of free ammonia or having a vapor pressure of one (1) PSIG or above at one hundred four (104) degrees Fahrenheit."). Possession of either of these substances alone with intent to manufacture methamphetamine is a Class D felony. *See* Ind.Code § 35–48–4–14.5(b).

19. *See* UNITED STATES DRUG ENFORCEMENT ADMINISTRATION, METHAMPHETAMINE FACTSHEET ("Methamphetamine is a powerful stimulant. It is a controlled substance that is manufactured in clandestine laboratories throughout the United States. It is easy to make using common household chemicals. No formal chemistry training is needed."), http://www.usdoj.gov/dea/pubs/pressrel/methfact01.html.

20. According to Majors, the LPD

stated if like a subject selected like two boxes or maybe just a couple of things of duct tape or fuel, just to—our camera system at the store can take their picture and just to take their picture and document it and then leave a message on their answering machine and then they usually come in and saw what the subject looked like and stuff like that.

Tr. at 11–12.

One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* (citation omitted). "When the State seeks to rely upon consent to justify a warrantless search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. The voluntariness of this consent to search is a question of fact to be determined from the totality of the circumstances." *Callahan v. State,* 719 N.E.2d 430, 435 (Ind.Ct.App.1999) (citation omitted).

■ "Under the Indiana Constitution, the State must show that a search was reasonable in light of the totality of the circumstances." *Ammons,* 770 N.E.2d at 931 (citation omitted); *see also Baldwin v. Reagan,* 715 N.E.2d 332, 337 (Ind.1999) ("Rather than employ federal concepts like the warrant requirement and probable cause requirement [in analyzing claims of search and seizure violations under the Indiana Constitution], we require instead that the State bear the burden of showing that, in the totality of the circumstances, the intrusion was reasonable.").

■ We note that in its order granting Bulington's motion to suppress, the trial court did not specify whether it reviewed the propriety of the search of his truck under the state or the federal constitution. Neither does the State offer separate state and federal constitutional analyses in its appellate brief. Given that we must consider the totality of the circumstances surrounding Bulington's consent under either branch of jurisprudence, we conclude that a search to which a defendant freely and voluntarily consents is valid under the Fourth Amendment of the United States Constitution and reasonable under Article I, Section 11 of the Indiana Constitution.

A consent to search is valid except where it is procured by fraud, duress, fear, intimidation, or where it is merely a submission to the supremacy of the law. To constitute a valid waiver of Fourth Amendment rights, a consent must be the intelligent relinquishment of a known right or privilege. Such a waiver cannot be conclusively presumed from a verbal expression of assent unless the court determines, from the totality of the circumstances, that the verbal assent reflected an understanding, uncoerced, and unequivocal election to grant the officers a license which the person knows may be freely and effectively withheld. Knowledge of the right to refuse a search is one factor which indicates voluntariness.

The "totality of the circumstances" from which the voluntariness of a detainee's consent is to be determined includes, but is not limited to, the following considerations: (1) whether the defendant was advised of his *Miranda* rights prior to the request to search; (2) the defendant's degree of education and intelligence; (3) whether the defendant was advised of his right not to consent; (4) whether the detainee has had previous encounters with law enforcement; (5) whether the officer made any express or implied claims of authority to search without consent; (6) whether the officer was engaged in any illegal action prior to the request; (7) whether the defendant was cooperative previously; and (8) whether the officer was deceptive as to his true identity or the purpose of the search. *Callahan,* 719 N.E.2d at 435 (citations omitted).

The evidence is undisputed that three police officers and three police vehicles were present at the scene of the stop; that McCoy had informed Bulington of the rea-

son for the stop and performed a consensual patdown search of his person; and that McCoy had asked for and retained Bulington's driver's license and registration.[21] When McCoy asked for Bulington's consent to search the truck, Bulington shook his head "yes". Tr. at 36. When McCoy sought to clarify the meaning of this response, Bulington "said yes that [McCoy] could search his vehicle." *Id.* at 52. The totality of these circumstances indicates that Bulington's consent was not procured by fraud, duress, fear, or intimidation and was not merely a submission to the supremacy of the law; that Bulington need not have been advised of his *Miranda* rights because he was not subjected to custodial interrogation;[22] that none of the officers made any express or implied claims of authority to search without consent; that McCoy had not engaged in any illegal action prior to the request; that there was no indication that Bulington had been uncooperative; and that McCoy was not deceptive as to his true identity or the purpose of the search. *See Lyons*, 735 N.E.2d at 1185. The record is silent with respect to the remaining considerations mentioned in *Lyons* but clearly indicates that Bulington's consent to the search of his truck was freely and voluntarily given and that the search was therefore valid under the Fourth Amendment of the United States Constitution and reasonable under Article I, Section 11 of the Indiana Constitution. The trial court's ruling on

this issue is contrary to law. We therefore reverse its grant of Bulington's motion to suppress and remand for further proceedings.

Reversed and remanded.

KIRSCH, J., concurs.

DARDEN, J., dissents with opinion.

DARDEN, Judge, dissenting.

I would respectfully dissent, as I find it greatly disturbing that the simple purchase of more than one package of cold medication[23] could subject a citizen to an investigatory stop by law enforcement.

The State argues that the stop was permissible because Officer McCoy had reasonable suspicion of criminal activity based upon the report by Majors that the two men had each bought three packages of ephedrine. The State specifically argues that it was the "large quantity" of the methamphetamine precursor ephedrine which was purchased that created the reasonable suspicion. State's Br. at 6. However, beyond the fact that there were three packages of ephedrine, there is no evidence as to the quantity. We do not know what size packages these were, *e.g.* containing twelve pills or forty-eight pills each, and there was no testimony as to the recommended dosage of these pills. If, hypothetically, the packages contained twelve pills each, to be taken every four

---

**21.** Because McCoy's detention of Bulington was an investigatory stop from the outset, Bulington's reliance on *Finger v. State*, 769 N.E.2d 207 (Ind.Ct.App.2002), *petition for trans. filed*, (Sept. 27, 2002), is misplaced with respect to his argument that McCoy's retention of his driver's license and registration transformed "what may have been a consensual encounter" into "an illegal investigatory stop[.]" Appellee's Br. at 14.

**22.** *See Green v. State*, 753 N.E.2d 52, 58 (Ind. Ct.App.2001) (noting that "police officers are

not required to give *Miranda* warnings unless the defendant is 'both in custody and subject to interrogation[ ]' ") (citation omitted), *trans. denied.*

**23.** The record indicates that the Meijer clerk testified that the men were looking at "nasal decongestants," and Majors testified that one man bought "cold medicine" and the second bought "antihistamine." (Tr. 15). Officer McCoy testified that he had been informed that the men purchased ephedrine.

hours, and each man had a family with several individuals sick, the purchase of three packages apiece would not amount to criminally suspicious behavior.[24]

The majority finds that it was reasonable for McCoy to infer that the two men knew of, or might have suspected the existence of, the store policy of alerting police upon the purchase of "certain quantities and/or combinations of methamphetamine precursors and that they had attempted to purchase one such precursor in a manner calculated to avoid suspicion." Op. at 346. I do not find this to be a reasonable inference, inasmuch as the men bought the quantity which had been deemed suspicious and prompted notification of authorities. It might have been arguably reasonable to so infer had the men only bought two packages of medication each. Nevertheless, I find nothing in the criminal statutes or in the common law which would lead me to find that the purchase of cold medicine could support the reasonable suspicion of criminal activity and thereby warrant an investigatory stop. Therefore, in my opinion, the evidence here does not lead to a result opposite the trial court's conclusion—that the articulated facts known to McCoy[25] did not warrant official intrusion on Bulington's "right to personal security free from arbitrary interference by law enforcement." (App. 60). *See Glass*, 769 N.E.2d at 641.

Under Article 1, Section 11, of the Indiana Constitution, an investigatory stop is permissible if the officer reasonably suspects that the individual "is engaged in, or about to engage in, illegal activity." *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001). "Reasonable suspicion exists if the facts known to the officer, together with the reasonable inferences arising therefrom, would cause an ordinarily prudent person to believe that criminal activity" has occurred or is about to occur. *Id.* at 786–87. The State again argues that the stop was reasonable based on the information that the two men "were in possession of a large quantity of ephedrine, a precursor for methamphetamine." State's Br. at 6. For the same reasons that I find the evidence articulated by McCoy for having stopped Bulington to be insufficient to justify a stop permissible under the Fourth Amendment to the U.S. Constitution, I would also find the evidence does not warrant the stop under Article 1, Section 11, of the Indiana Constitution.

Finally, the State contends the stop was required because McCoy had a duty to confirm the information from Majors, cit-

**24.** I further note that the record indicates that LPD was to be called when Meijer personnel saw someone purchase "three boxes or more of cold medicine, antihistamines, Robitussin...." (Tr. 11). Thus, if one was suffering cold symptoms and bought Robitussin, an antihistamine product, and a throat spray, under the majority opinion that person would be subject to an investigatory stop by law enforcement such as was conducted here.

**25.** At the hearing on the motion to suppress, McCoy testified that he was dispatched on a report of two men who "had purchased the maximum amount of ephedrine." (Tr. 32). Asked what was meant by "the maximum amount," McCoy answered, "three boxes per person," but then testified that he was not aware of any law limiting to three the number of ephedrine packages a person could legally purchase. (Tr. 46). When asked why he had stopped Bulington, he testified that it was the Meijer store report about the men having "purchased the maximum amount" and "that they were acting in a suspicious manner." (Tr. 32). However, McCoy provided no testimony about any reported suspicious action, and he did not testify that he had witnessed any suspicious action by Bulington and his passenger. Furthermore, Majors did not testify to having reported any suspicious act by Bulington other than the three-package purchase. McCoy also conceded at the hearing that there had been no traffic violation and that he had no basis for a traffic stop.

ing *State v. Eichholtz*, 752 N.E.2d 163 (Ind.Ct.App.2001). In *Eichholtz*, a citizen gave the license plate number and description of a vehicle which he reported to the 911 operator as crossing into the opposite lane of traffic and driving onto curbs. We held that because the citizen identified himself to the 911 operator such that he could have been held legally responsible for having filed a false police report, it was sufficient to justify an investigatory stop by police. In *Eichholtz*, the actions reported to the police, if true, constituted illegal conduct. If the actions had been observed by an officer, the officer could have executed an investigatory stop. However, here, what was reported to the police was not illegal conduct. As McCoy testified, no law proscribes the purchase of three packages of ephedrine; even if McCoy had observed Bulington make the purchase, in my opinion he would not have had sufficient grounds for an investigatory stop based solely thereon.

Finally, the State contends that the search of Bulington's truck was legal "because Bulington freely and voluntarily consented to the search" after having been stopped by McCoy for "a brief investigation based on reasonable suspicion." State's Br. at 8. I would not reach this argument because I would find that McCoy's initial stop of Bulington was illegal—as it was not based on reasonable suspicion. Thus, because in my opinion Bulington was subject to an illegal seizure, the evidence derivatively gained as a result of that seizure should be excluded as the "fruit" of that illegal seizure, or "fruit of the poisonous tree." *See Hanna v. State,* 726 N.E.2d 384, 389 (Ind.Ct.App.2000).

Accordingly, I would affirm the trial court.